T.C. Memo. 2002-260

UNITED STATES TAX COURT

SEYMOUR BRONSON AND PHYLLIS C. BRONSON, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11377-00, 11378-00,     Filed October 9, 2002.
            11383-00.

<u>E. Martin Davidoff</u>, for petitioners.

<u>Rodney J. Bartlett</u> and <u>Timothy S. Sinnott</u>, for respondent.

MEMORANDUM OPINION

DINAN, <u>Special Trial Judge</u>:  In separate notices of

deficiency, respondent determined that petitioners are liable for

the following additions to tax for the respective taxable years:

_____

[1]Cases of the following petitioners are consolidated
herewith:  Donald K. Gordon-Wylie and Frances T. Gordon-Wylie,
docket No. 11378-00; and James R. Garrity and Sandra T. Garrity,
docket No. 11383-00.

| Docket No. | Taxable Year Ending | Additions to Tax Sec. 6653(a)(1) | Sec. 6653(a)(2) |
|---|---|---|---|
| 11377-00 | Feb. 29, 1984 | $186 | * |
| 11378-00 | Dec. 31, 1983 | 256 | * |
| 11383-00 | Dec. 31, 1983 | 184 | * |

* 50% of the interest due on deficiencies of $3,712, $5,117, and $3,672, respectively.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.

The issue for decision is whether petitioners are liable for each of the additions to tax determined by respondent.[2]

### Background

Some of the facts have been stipulated and are so found. The stipulations of fact and those attached exhibits which were admitted into evidence are incorporated herein by this reference. On the date the petitions were filed in these cases, petitioners all resided in New Jersey.

Petitioners each invested in a venture known as Arid Land Research Partners ("Arid Land" or "the partnership") in December 1983. They all became involved with the partnership through Paul Trimboli, an accountant and financial planner. Prior to the time

---

[2]In each of the petitions, petitioners argued that (1) the notice of deficiency was issued "beyond the Statute of Limitations"; (2) the notice "is invalid due to the fact that the Commissioner failed to make a determination" after an examination of facts particular to petitioners' case; and (3) the Commissioner failed to allow petitioners "their appeal rights within the Internal Revenue Service". Petitioners concede the first issue. Petitioners did not address the remaining issues in their briefs, and we therefore consider them to have been abandoned and we need not address them here.

period in issue, Mr. Trimboli had worked at the public accounting firm Bugni, LaBanca & Paduano for approximately 7 years, doing primarily tax work and some auditing work.  In 1983, he started a business on his own as a certified public accountant and financial planner.  The education Mr. Trimboli had completed at that time--a bachelor's degree in accounting and the bulk of the courses required to become a certified financial planner through the College of Financial Planning--included courses in Federal and State taxation.  However, Mr. Trimboli had no experience as a financial planner prior to starting his own business in 1983.

Mr. Trimboli learned of jojoba investments in early 1983 through a financial planning association to which he belonged. In June 1983 and again in September 1983, Mr. Trimboli traveled to California to investigate the partnership as a potential investment opportunity.  He traveled to Blythe, California, and to Bakersfield, California, where there were plantations on which jojoba was already being grown.  He also visited a research facility located at and operated for the use of the University of California at Riverside which was involved in the growing of jojoba.  On the first trip, Mr. Trimboli was accompanied by Robert Cole--who would become the general partner of the partnership--and on the second trip he was accompanied by Mr. Cole and three of Mr. Trimboli's own colleagues.  On these trips, Mr. Trimboli also met with Eugene Pace, who was the president of

what was to become the purported research and development contractor to the partnership, U.S. Agri Research & Development Corp.

In all, Mr. Trimboli sold investments in the partnership to approximately seven of his clients. He received commissions for selling these interests in the partnership, similar to the commissions he received for selling other types of investments. Mr. Trimboli was retained by Arid Land to prepare the 1983 tax return for the partnership as well as to prepare the Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., sent to the individual investors reflecting their share of the losses claimed by the partnership on its own return. In preparing the return and the schedules, Mr. Trimboli relied on financial information provided by Mr. Cole and on the opinion letter given to Mr. Cole by outside counsel, discussed below. Mr. Trimboli subsequently prepared tax returns for individual clients, claiming the losses reflected on the Schedules K-1 as deductions.

Mr. Trimboli had no experience in farming or in research and development ventures. He could not recall the exact nature of Mr. Cole's experience which would be relevant to operating a jojoba operation, other than the fact that he knew that "there was some experience."

A private placement memorandum for investments in the partnership, dated December 1, 1983, was distributed to each of

the petitioners.  Prefatory material in the memorandum contained

the following caveats:

> PROSPECTIVE INVESTORS ARE CAUTIONED NOT TO CONSTRUE THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS AS CONSTITUTING LEGAL OR TAX ADVICE. * * * INVESTORS ARE URGED TO CONSULT THEIR OWN COUNSEL AS TO ALL MATTERS CONCERNING THIS INVESTMENT.

> *     *     *     *     *     *     *

> NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR TAX ADVANTAGES WHICH MAY ACCRUE TO THE INVESTORS IN THE UNITS.

> EACH PURCHASER OF UNITS HEREIN SHOULD AND IS EXPECTED TO CONSULT WITH HIS OWN TAX ADVISOR AS TO THE TAX ASPECTS.

In a section entitled "Use of Proceeds", an estimation of various

expenditures, the memorandum stated that 90.7 to 93.0 percent of

the capital contributions from the partners would be allocated to

the research and development contract (regardless of the total

amount of the contributions).  The only other expenses were to be

organizational costs, legal fees, and commissions.  One of the

"risk factors" listed for the investment contained the following

discussion:

> Federal Income Tax Consequences:  An investment in the units involves material tax risks, some of which are set forth below.  Each prospective investor is urged to consult his own tax advisor with respect to complex federal (as well as state and local) income tax consequences of such an investment.
> *     *     *     *     *     *     *

> (c) Validity of Tax Deductions and Allocations.

> The Partnership will claim all deductions for federal income tax purposes which it reasonably

believes it is entitled to claim.  There can be no assurance that these deductions may not be contested or disallowed by the Service * * * .  Such areas of challenge may include * * * expenditures under the R & D Contract * * * .

* * * * * * *

The Service is presently vigorously auditing partnerships, scrutinizing in particular certain claimed tax deductions. * * * Counsel's opinion is rendered as of the date hereof based upon the representations of the General Partner * * * .  Counsel shall not review the Partnership's tax returns. * * *

(d) <u>Deductibility of Research or Experimental Expenditures.</u>

The General Partner anticipates that a substantial portion of the capital contributions of the Limited Partners to the Partnership will be used for research and experimental expenditures of the type generally covered by Sections 174 and 44F of the Code (particularly in recently issued IRS regulations issued thereunder).  However, prospective investors should be aware that there is little published authority dealing with the specific types of expenditures which will qualify as research or experimental expenditures within the meaning of Section 174, and most of the expenditures contemplated by the Partnership have not been the subject of any prior cases or administrative determinations.

There are various theories under which such deductions might be disallowed or required to be deferred. * * * No ruling by the Service has been or will be sought regarding deductibility of the proposed expenditures under Section 174 of the Code.

A section entitled "Tax Aspects" contains the following information concerning a legal opinion from outside counsel obtained by the general partner:

The General Partner has received an opinion of counsel concerning certain of the tax aspects of this investment. The opinion * * * is available from the General Partner.

Since the tax applications of an investment in the Partnership vary for each investor, neither the Partnership, the General Partner nor counsel assumes any responsibility for tax consequences of this transaction to an investor. * * * The respective investors are urged to consult their own tax advisers with respect to the tax implications of this investment. * * *

The opinion letter referenced in the private placement memorandum was one which purportedly had been written for Mr. Cole by outside counsel based on information provided by Mr. Cole. The letter, dated December 7, 1983, concludes by stating general caveats and disclaimers along with the opinion that "it is more likely than not that a partner of Arid Land Research Partners, a Limited Partnership will prevail on the merits of each material tax issue presented herein." However, the conclusions regarding the issue of the section 174 deduction in particular were vague and nonconclusive in nature.

Finally, the investor subscription agreement accompanying the private placement memorandum required a subscriber upon purchase of an interest to aver that:

He understands that an investment in the Partnership is speculative and involves a high degree of risk, there is no assurance as to the tax treatment of items of Partnership income, gain, loss, deductions of credit and it may not be possible for him to liquidate his investment in the Partnership.

As the result of partnership level proceedings concerning Arid Land Research Partners, this Court ultimately entered a decision disallowing in full the partnership's claimed ordinary loss of $463,688 for taxable year 1983. This decision was based

upon a stipulation by the partnership and the Commissioner to be bound by the outcome of the case in which this Court rendered our opinion in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. In that case, we found that the Utah Jojoba I Research partnership ("Utah I") was not entitled to a section 174(a) research or experimental expense deduction (or a section 162(a) trade or business expense deduction) because (a) Utah I did not directly or indirectly engage in research or experimentation, and (b) the activities of Utah I did not constitute a trade or business, nor was there a realistic prospect of Utah I ever entering into a trade or business. Id.

The Bronsons

Petitioner Seymour Bronson operated a retail business during 1983 which he had operated since 1949 and in which he had several employees. The business took in gross receipts of $195,838 during the year in issue, for a profit of $15,706. Prior to opening the business, Mr. Bronson had attended college for a time and had served in the military in World War II. He has no academic background in finance, economics, or taxation, but he did have a course in accounting. He had limited experience in investments prior to Arid Land.

Petitioner Phyllis C. Bronson also operated a retail business during 1983. She had operated the business since 1973, and during the year in issue the business took in gross receipts

of $316,085 for a profit of $20,902. Mrs. Bronson also had a partial college education, with no courses in economics, finance, or taxation, and she had limited investment experience.

Mr. Trimboli began doing work for the Bronsons approximately 3 years prior to 1983. The Bronsons were clients of Bugni, LaBanca & Paduano, and Mr. Trimboli had assisted in preparing their tax returns. The Bronsons were aware that Mr. Trimboli received commissions for selling interests in Arid Land as well as other investments. In December 1983, the Bronsons purchased seven units in Arid Land through Mr. Trimboli for a total of $7,700 in cash and a promissory note of $11,550.

The Bronsons filed a joint Federal income tax return for the taxable year ending February 28, 1984. On this return, they reported the following amounts of income and loss:[3]

| | |
|---|---|
| Business income | $37,138 |
| Interest income | 1,030 |
| Dividends | 603 |
| Capital gain distribution | 78 |
| "Management fee" income | 825 |
| Partnership income | 411 |
| Subtotal | 40,085 |
| Arid Land loss | (17,369) |
| Total income | 22,716 |

Laura DiTommaso, an accountant at Bugni, LaBanca & Paduano and a colleague of Mr. Trimboli, was listed as the return preparer on

---

[3]We use the terms "income" and "loss" primarily to reflect the items reported on the "income" section of the Form 1040, U.S. Individual Income Tax Return, filed by petitioners. We use this terminology rather than the more technical terminology of the Internal Revenue Code because these are the amounts reflected on the faces of the returns which petitioners signed.

the Bronsons' tax return for the taxable year in issue.  Ms.
DiTommaso does not specifically recall preparing the return in
question.  However, the procedure which she would have followed
at the time was to use the Schedule K-1 provided and to rely upon
the information on the schedule because nothing looked "odd or
out of the ordinary".

Following the entry of the decision concerning the
partnership, discussed above, respondent adjusted the Bronsons'
return by disallowing their claimed share of the partnership
loss, $17,369, and making a computational adjustment to their
itemized deductions.  In the statutory notice of deficiency which
provides the basis for our jurisdiction in this case, respondent
determined that the Bronsons are liable for additions to tax
under section 6653(a)(1) and (2) in the respective amounts of
$186 and 50 percent of the interest due on a $3,712 deficiency.
Prior to issuing the notice of deficiency, respondent did not
make inquiries of the Bronsons concerning the proposed
adjustments, nor did respondent provide them with an opportunity
for an administrative appeal.

The Gordon-Wylies

Petitioner Donald K. Gordon-Wylie was a sales account
manager at Digital Equipment Corporation during 1983.  He
possesses an associate's degree and has no academic background in
accounting, finance, tax, or economics.  Petitioner Frances T.

Gordon-Wylie worked as a receptionist and clerk at Bugni, LaBanca & Paduano during 1983. Both of the Gordon-Wylies had limited investing experience.

Mrs. Gordon-Wylie met Mr. Trimboli several years prior to 1983 while working at Bugni, LaBanca & Paduano. Mr. Gordon-Wylie was introduced to Mr. Trimboli in 1983, when Mr. Trimboli began preparing the Gordon-Wylies' tax returns as well as assisting them with financial planning. In December 1983, the Gordon-Wylies purchased six units in Arid Land through Mr. Trimboli for a total of $6,600 in cash and a promissory note of $9,900.

The Gordon-Wylies filed a joint Federal income tax return for the taxable year 1983. On this return, they reported the following amounts of income and loss:[4]

| | |
|---|---|
| Wages | $63,673 |
| Interest income | 276 |
| Dividends | 978 |
| Capital loss | (1,153) |
| Rental loss | (2,943) |
| Subtotal | 60,831 |
| Arid Land loss | (14,888) |
| Total income | 45,943 |

Mr. Trimboli prepared the Gordon-Wylies' return for taxable year 1983.

Following the entry of the decision concerning the partnership, discussed above, respondent adjusted the Gordon-Wylies' return by disallowing their claimed share of the

---

[4]See supra note 3.

partnership loss, $14,888. In the statutory notice of deficiency which provides the basis for our jurisdiction in this case, respondent determined that the Gordon-Wylies are liable for additions to tax under section 6653(a)(1) and (2) in the respective amounts of $256 and 50 percent of the interest due on a $5,117 deficiency. Prior to issuing the notice of deficiency, respondent did not make inquiries of the Gordon-Wylies concerning the proposed adjustments, nor did respondent provide them with an opportunity for an administrative appeal.

The Garritys

During 1983, petitioners James R. Garrity and Sandra T. Garrity assisted in operating a family-run Exxon Service Center. Mr. Garrity has a bachelor's degree in business and has taken basic courses in taxes and economics. Mrs. Garrity has a high school education and has no academic background in taxes, economics, or finance.

Mr. Trimboli had been assisting the Garritys and their family with their personal and corporate tax returns for several years prior to 1983. The Garritys knew that Mr. Trimboli would likely receive a commission for selling them an interest in Arid Land. In December 1983, the Garritys purchased five units in Arid Land through Mr. Trimboli for a total of $5,500 in cash and a promissory note of $8,250.

The Garritys filed a joint Federal income tax return for the taxable year 1983.  On this return, they reported the following amounts of income and loss:[5]

| | |
|---|---:|
| Wages | $46,158 |
| Interest income | 1,015 |
| Subtotal | 47,173 |
| Arid Land loss | (12,407) |
| Total income | 34,766 |

Mr. Trimboli prepared the Garritys' return for taxable year 1983.

Following the entry of the decision concerning the partnership, discussed above, respondent adjusted the Garritys' return by disallowing their claimed share of the partnership loss, $12,407.  In the statutory notice of deficiency which provides the basis for our jurisdiction in this case, respondent determined that the Garritys are liable for additions to tax under section 6653(a)(1) and (2) in the respective amounts of $184 and 50 percent of the interest due on a $3,672 deficiency. Prior to issuing the notice of deficiency, respondent did not make inquiries of the Garritys concerning the proposed adjustments, nor did respondent provide them with an opportunity for an administrative appeal.

## Discussion

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the

---

[5]See supra note 3.

underpayment is attributable to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is defined to include "any failure to reasonably comply with the Tax Code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." Merino v. Commissioner, 196 F.3d 147, 154 (3d Cir. 1999) (quoting Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990)), affg. T.C. Memo. 1997-385.

Petitioners' primary argument is that they were not negligent because they relied on advice from Mr. Trimboli and, in the case of the Bronsons, Ms. DiTommaso. Reasonable reliance on professional advice may be a defense to the negligence additions to tax. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on another issue 501 U.S. 868 (1991). The advice must be from competent and independent parties, not from the promoters of the investment. LaVerne v. Commissioner, 94 T.C. 637, 652 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).

Petitioners analogize their cases to <u>Anderson v.</u>
<u>Commissioner</u>, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C.
Memo. 1993-607.  In <u>Anderson</u>, the taxpayer relied on both an
investment adviser and an accountant in making his investment.
The Court of Appeals, although it affirmed the decision of the
Tax Court that the taxpayers were liable for additions to tax for
negligence, found that reliance on the investment adviser, who
received a commission for selling the investment to the taxpayer,
was reasonable under the circumstances of the case.  Cf., e.g.,
<u>Carmena v. Commissioner</u>, T.C. Memo. 2001-177 (financial adviser
receiving commissions for sale of investments had inherent
conflict of interest in advice given to investors).  However, the
Court of Appeals stressed that the investment adviser--an
independent insurance agent and registered securities dealer--was
a good friend of the taxpayer and was not affiliated with the
investment the taxpayers entered into.  <u>Anderson v. Commissioner</u>,
<u>supra</u> at 1271.

The present cases are distinguishable from <u>Anderson</u> in two
important respects.  First, in the cases at hand, Mr. Trimboli
was involved with principals of the investment prior to the
creation of the partnership.  In particular, he was in contact
with Mr. Cole, who was to become the general partner of Arid
Land, and with Mr. Pace, who was to become the president of the
research and development contractor.  Although petitioners argue

that Mr. Trimboli was an outsider who coincidentally prepared the partnership's return and the Schedules K-1, we find that Mr. Trimboli's relationship with the partnership and its principals makes him more than a disinterested commission-based salesman, as was the case in <u>Anderson</u>. In light of his relationship to Arid Land, Mr. Trimboli cannot be considered to be an independent adviser.

Second, the investment adviser in <u>Anderson</u> was a good friend of the taxpayer. Petitioners' purely professional relationships with Mr. Trimboli, spanning no more than several years, are not analogous to the close friendship between taxpayer and adviser in <u>Anderson</u>. See also <u>Dyckman v. Commissioner</u>, T.C. Memo. 1999-79 (taxpayers reasonably relied on an adviser who was a close personal friend); <u>Reile v. Commissioner</u>, T.C. Memo. 1992-488 (taxpayers reasonably relied on advice from an adviser who was an acquaintance and fellow "temple recommend holder"). Furthermore, petitioners' professional dealings with Mr. Trimboli were only in the context of an accountant-client relationship (or that of a coworker, as was the case with Mrs. Gordon-Wylie). No petitioner could have had prior dealings with Mr. Trimboli as a financial planner because he had no experience in the field prior to 1983. Cf. <u>Wright v. Commissioner</u>, T.C. Memo. 1994-288 (taxpayers reasonably relied upon an individual who was recommended to them as a financial adviser, who had a strong presence in the

community as such, and who misled the taxpayers concerning the propriety of an investment).  Thus, the relationships between petitioners and Mr. Trimboli were not close enough or prolonged enough--either personally or professionally--to merit special consideration in the level of due care required by petitioners in these cases.

With respect to his role as tax adviser,[6] Mr. Trimboli largely relied on the opinion letter addressed to Arid Land's general partner, Mr. Cole.  There is little to indicate that Mr. Trimboli researched the issues himself thoroughly enough to come to any independent conclusions concerning the propriety of the deductions.  We find that Mr. Trimboli's reliance on the opinion letter further supports our conclusion that Mr. Trimboli did not render independent, objective advice concerning the propriety of the partnership's position on tax issues.  Thus, we do not accept petitioners' assertion that Mr. Trimboli's reliance on the opinion letter should itself insulate petitioners from the negligence additions to tax.

Because Mr. Trimboli was not an independent adviser, petitioners' reliance on any advice from him was not reasonable. Bello v. Commissioner, T.C. Memo. 2001-56 (reliance on advice

---

[6]We assume for the sake of argument that petitioners approached Mr. Trimboli for substantive tax advice.  There is no evidence in the record that any petitioner did more than rely on Mr. Trimboli's representation that Arid Land was a good financial investment.

from an accountant concerning an investment was unreasonable where the accountant had been retained by the investment promoter); LaVerne v. Commissioner, supra; Rybak v. Commissioner, supra.

Petitioners assert that the standard set forth by the Fifth Circuit Court of Appeals in Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, should be applicable in this case. In Heasley, the court found that the taxpayers-- who were moderate-income, blue-collar investors with little education or prior investment experience--were to be held to a lower standard of due care when evaluating whether they were negligent in making an investment. The court found that the taxpayers, the Heasleys, were not negligent because, among other reasons, they had relied on financial advisers. Id. at 384. The financial consultant who had sold the Heasleys the investment had referred them to an independent accountant for assistance in preparing their tax return with respect to the investment. The accountant, in turn, had reviewed the investment materials prior to completing the return. The court noted that "nothing in the record supports a finding that Smith [the accountant] did not independently assess the Heasleys' tax liability or that Danner [the financial consultant] influenced Smith's calculations." Id. at 384 n.9.

Heasley is not applicable to the cases at hand.  First, petitioners in these cases, although having limited investment experience, are not entirely unsophisticated in business matters: The Bronsons operated two sole proprietorships; Mr. Gordon-Wylie was a corporate sales account manager; Mrs. Gordon-Wylie was employed by an accounting firm; and the Garritys assisted in the operation of an incorporated business.  Second, we have found petitioners' reliance on Mr. Trimboli to be unreasonable because he was not an independent adviser.  Furthermore, the Gordon-Wylies and the Garritys relied solely on one individual, and that individual both sold them their investment and advised them as to its legal effect without independently researching the legal issues involved.  The Bronsons also effectively relied on one individual because, as discussed below, they did not consult with their return preparer concerning the investment, nor did the preparer independently investigate it herself before classifying the purported loss as a deduction.

In addition to reliance on Mr. Trimboli, the Bronsons also claim reliance on their tax return preparer, Ms. DiTommaso.  From the record, we conclude Ms. DiTommaso's role was confined to a routine return preparation in which she merely transferred the purported loss from the Schedule K-1 onto the Bronsons' return–the Bronsons neither sought nor received from Ms. DiTommaso any particular advice concerning the investment or the

related deduction.  Blind reliance on a return preparer is not a defense to negligence, and taxpayers retain a duty to file an accurate return and generally are required to review their return before signing it.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987).  Furthermore, in order to avoid a negligence addition to tax with respect to an error on a return, the error must be the result of the preparer's mistake based upon otherwise correct information provided by the taxpayer.  Pessin v. Commissioner, 59 T.C. 473, 489 (1972).  Submitting the Schedule K-1 reflecting an improper loss to their return preparer, and in turn receiving a completed tax return reflecting the same loss, does not constitute a defense to negligence in the Bronsons' case.

Finally, petitioners cite Hummer v. Commissioner, T.C. Memo. 1988-528, for the proposition that taxpayers cannot be negligent where the relevant legal issue was "not well settled". Petitioners, however, did not receive substantive advice concerning the deduction from anyone independent of the investment, nor did they conduct their own investigation into the propriety of the deduction.  Indeed, there is no indication that petitioners ever were aware of the nature of the purportedly uncertain legal issues involved.  Petitioners may not rely upon a "lack of warning" as a defense to negligence where no reasonable investigation was ever made, and where they were repeatedly

warned of the relevant risks in the private placement memorandum.
Christensen v. Commissioner, T.C. Memo. 2001-185; Robnett v.
Commissioner, T.C. Memo. 2001-17.

The private placement memorandum contained numerous warnings
regarding the tax risks involved with making an investment in
Arid Land.  Although the parties stipulated that petitioners all
received a copy of the private placement memorandum, for the most
part petitioners could not recall having seen and/or having
reviewed the memorandum prior to making an investment.  In any
case, the warnings were there and would have been evident if
petitioners had exercised reasonable care and read the
memorandum.  After making their investments regardless of these
risks, petitioners claimed large losses despite the fact that
they had only recently invested cash in amounts far less than the
amounts of the losses:[7]  The Bronsons paid $7,700 and claimed a
loss of $17,369 (43.3 percent of their income); the Gordon-Wylies
paid $6,600 and claimed a loss of $14,888 (24.5 percent of their
income); and the Garritys paid $5,500 and claimed a loss of

---

[7]Petitioners argue that the instructions for Schedules K-1 provided by the Internal Revenue Service required them to report the loss.  The instructions state that the individual taxpayer "must treat partnership items * * * consistent with the way the partnership treated the items on its filed return."  The instructions have further provisions dealing with errors on Schedules K-1 as well as with the filing of statements to explain inconsistencies between the partnership's return and the taxpayer's return.  We find to be unreasonable any belief by petitioners or their return preparers that they were required by law to mechanically deduct a loss which was improper.

$12,407 (26.3 percent of their income).[8]  These disproportionate and accelerated losses--along with the resulting substantial tax savings--should have been further warning to petitioners for the need to obtain outside, independent advice regarding the propriety of the deduction.  Despite these warnings, petitioners did not seek such advice or conduct any other type of inquiry into the propriety of the deductions.  We find that it was negligent for petitioners to have claimed these deductions under the circumstances of these cases.  We sustain respondent's determinations that petitioners are liable for the section 6653(a)(1) and (2) additions to tax for negligence.

　　To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.

---

[8]See <u>supra</u> note 3.